IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-60475

Summary Calendar
_____


ROBERT WALLACE DISMUKE

                                        Plaintiff-Appellant

        v.

CITY OF INDIANOLA;
CARVER RANDLE, JR

                                        Defendants-Appellees

_____

Appeal from the United States District Court
for the Northern District of Mississippi
No. 4:00CV21-P-B
_____
February 11, 2002

Before KING, Chief Judge, and HIGGINBOTHAM and BENAVIDES, Circuit
Judges.

PER CURIAM:[*]

        Plaintiff-Appellant Robert Wallace Dismuke appeals the

district court's summary judgment in favor of Defendants-

Appellees City of Indianola and Carver Randle, Jr. on claims

alleging racially discriminatory discharge and retaliatory

discharge.  For the following reasons, we AFFIRM.

_____

        [*]  Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

## I.  FACTUAL AND PROCEDURAL HISTORY

On January 20, 1999, Plaintiff-Appellant Robert Wallace Dismuke, a Caucasian then employed as an officer of the Indianola Police Department ("IPD"), pursued a suspect on foot.  The suspect, James Gardner, fled apprehension by IPD officers because the suspect was informed at the IPD station where Dismuke was employed that there was an outstanding warrant for the suspect's arrest for failure to pay parking fines.  In the parking lot of the station, Gardner attempted to depart in his vehicle, but another IPD officer, Assistant Chief Marlon Hendon, blocked Gardner's path by stepping in front of Gardner's vehicle.  Hendon ordered Gardner to exit the vehicle.  Gardner drove forward instead, and Hendon placed his hands on the hood of the vehicle and "bounced off" it to the passenger side.  At the time Dismuke saw Hendon "bounce" off of the vehicle, Dismuke fired his weapon at Gardner's vehicle from the passenger side.  A bullet entered the vehicle through the rear passenger window and struck Gardner's elbow.  Gardner then fled the scene in his vehicle but was apprehended by Dismuke and another officer and taken into custody.

Defendant-Appellee Indianola Police Chief Carver Randle, Jr., an African-American, ordered incident reports from Hendon and Dismuke, as well as from the Court Clerk Jan Hammett, who originally informed Gardner of the warrant for the suspect's

arrest.  After reviewing the reports and photographs taken of

Gardner's vehicle and discussing the incident with Hendon, Randle

decided that Dismuke violated an IPD policy against the use of

excessive force by firing his weapon and, thus, that Dismuke

should be discharged.  On January 25, 1999, Randle transmitted a

letter to City of Indianola Mayor James Hutcheson ("the Mayor"),

in which Randle recommended Dismuke's dismissal based on the

officer's use of excessive force.[2]  Subsequently, at Hendon's

suggestion, the IPD requested that three investigators from other

police departments participate in a "shooting review board."[3]

---

[2]  In his January 25 letter recommending Dismuke's
dismissal, Randle cited Dismuke's violation of section 11.3 of
the IPD Code of Conduct, which reads in relevant part:

> Potentially deadly force may be used after an officer
> has exhausted all other means to apprehend or otherwise
> prevent the commission of a felonious act or the
> protection of life .... [A]n officer shall discharge
> his firearm at a person only under those conditions
> where he would be justified if he killed the person at
> whom he was shooting .... [A] weapon may only be
> removed from the officer's holster under the following
> circumstances [, including:] .... [i]f there is a
> substantial risk that the person whose arrest is sought
> will cause death or serious bodily harm ... [for
> example, when] an officer approaches a subject on foot
> or ... in an automobile [and] has reasonable cause to
> believe the subject presents an immediate danger to the
> officer.

[3]  Dismuke alleges that no "shooting review board" had ever
been convened by the IPD before and that its use, therefore,
offers evidence of Randle's animus toward him.  Dismuke further
claims that the fact that the outside investigators never
interviewed him is further evidence of Randle's animus.  However,
the uncontroverted testimony of both Hendon and Randle indicates
that it was Hendon's suggestion to call the outside

After discussing the incident with Hendon, viewing the scene, and reviewing the incident reports, including Dismuke's written report, all three investigators indicated to Randle and Herndon that if the incident occurred in their own departments, dismissal would be appropriate. In written reports, dated September 13, 2000, all three investigators indicated that the fact that the shot was taken near a "busy" intersection and in the direction of a convenience store was a significant factor in their conclusions.[4]

On February 4, 1999, the City held a hearing in front of its City Administrative Personnel Commission ("the Commission") at which Randle, Hendon, and Dismuke testified to their version of events. The four Commission members also reviewed, inter alia, Hendon's and Dismuke's incident reports, a letter from Hendon discussing the findings of the "shooting review board," section 11.3 of the IPD Code of Conduct, and an additional IPD policy governing the use of firearms, General Order Number: 95-14.[5] The

investigators, that Hendon in fact called them, and that Dismuke's shooting was the first such incident during Randle's tenure as IPD Chief. Moreover, it is uncontroverted that the investigators reviewed Hendon's official written police incident report that he filled out at the time of the shooting.

[4] Hendon and Randle testified that, at the time of the original review of the shooting, in early 1999, the three outside investigators communicated their findings to Hendon and Randle informally. The three investigators' written reports in evidence were prepared approximately eighteen months later.

[5] General Order Number: 95-14 reads in relevant part:

4

four members voted unanimously to support Randle's recommendation to discharge Dismuke. On February 18, 1999, the City of Indianola Board of Aldermen ("the Board") reviewed the Commission's report on the hearing and its recommendation. After hearing argument by Dismuke's attorney, the four Board members likewise voted unanimously to discharge Dismuke, effective immediately.

On February 3, 2000, Dismuke filed claims against Defendant-Appellee City of Indianola ("the City") and Randle in his individual capacity, alleging, pursuant to 42 U.S.C. § 1981 (1999), racially discriminatory discharge and, pursuant to Mississippi state law, retaliatory discharge. The district court granted summary judgment in favor of the defendants on both claims. Dismuke now timely appeals summary judgment on both claims.

## II.  STANDARD OF REVIEW

We review summary judgment de novo, applying the same standard as the district court. <u>Chaney v. New Orleans Pub.</u>

---

Police officers shall not discharge their firearms when doing so may endanger innocent persons, unless, the use of deadly force is needed to protect the life of the officer or another individual .... Police officers shall not discharge their firearms to subdue an escaping suspect who presents no immediate threat of death or serious bodily injury .... Police officers shall not discharge their weapons at a moving vehicle unless it is absolutely necessary to do so to protect the life of the officer or others.

5

Facility Mgmt., Inc., 179 F.3d 164, 167 (5th Cir. 1999). Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). We view the evidence in the light most favorable to the non-movant. Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997). However, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" Britt v. Grocers Supply Co., Inc., 978 F.2d 1441, 1449 (5th Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

### III.  § 1981 DISCRIMINATORY DISCHARGE CLAIM

Dismuke claims that the district court erred in finding that he failed to sustain a claim of racially discriminatory discharge under 42 U.S.C. § 1981. This court analyzes a § 1981 claim alleging discriminatory discharge using the same burden shifting framework established for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). E.g., Raggs v. Miss. Power & Light Co., No. 00-60874, 2002 WL 13632, at *3 (5th Cir. Jan. 3, 2002) (slip opinion) (citations omitted). Under this framework, Dismuke must establish a prima facie case of discriminatory discharge, then the burden shifts to the defendants to furnish a

6

legitimate nondiscriminatory reason for the discharge.  If the defendants provide such a reason, Dismuke must show by a preponderance of the evidence that the proffered reason for discharging him was mere pretext for racial discrimination.  <u>Id.</u> (internal citations omitted).  The ultimate burden of persuasion that the defendants intentionally discriminated against Dismuke remains at all times with Dismuke.  <u>Id.</u> (citations and quotation omitted).

In a case involving discharge for violation of work rules or policy, a plaintiff may establish a prima facie case by demonstrating either that the plaintiff did not violate the rule in question or that other employees who engaged in similar violations were not punished similarly.  <u>Green v. Armstrong Rubber Co.</u>, 612 F.2d 967, 968 (5th Cir. 1980) (citing <u>Turner v. Tex. Instruments, Inc.</u>, 555 F.2d 1251, 1254-55 (5th Cir. 1977)).[6]

_____

[6]  Dismuke appears to argue on appeal that the district court erred in finding that he failed to point to a fact issue regarding whether he established a prima facie case on the ground that African-American employees that violated similar rules were disciplined less severely.  Because the district court found that Dismuke raised a material issue of fact regarding his prima facie case on the alternative ground that he did not actually violate the IPD policy, it is unnecessary to address this argument.  We note, however, that the district court was correct in holding that in order to establish a prima facie case based on disparate discipline, a plaintiff must point to evidence of employees disciplined less harshly "under circumstances 'nearly <u>identical</u>'" to that of Dismuke.  <u>Mayberry v. Vought Aircraft Co.</u>, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting <u>Little v. Republic Ref. Co.</u>, 924 F.2d 93, 97 (5th Cir. 1991)) (emphasis added).  Our review of the record indicates that the district court also was correct in finding that Dismuke points to incidents of less harshly disciplined African-American IPD employees in circumstances too

The district court found that Dismuke raised a material issue of fact as to whether he actually violated the IPD's policy against use of excessive force and, thus, whether he established a prima facie case of discriminatory discharge. The court based this finding on affidavit testimony from two officers present at the station just after the shooting, Elise Miller and Dean Miller. Both officers testified that, just after the shooting, they heard Hendon express the view that Dismuke's actions were appropriate under the circumstances and that Dismuke made a "good shot." Such testimony controverts Hendon's deposition and affidavit testimony, as well as Randle's deposition testimony, indicating that Hendon originally told Randle at the scene that Hendon believed that Dismuke's action constituted excessive use of force because Hendon was "out of harm's way" by the time Dismuke fired his weapon. We agree with the district court, therefore, that Dismuke created an issue of fact regarding

attenuated to that of Dismuke to establish a prima facie case. Dismuke pointed to evidence of only one prior shooting, for which a prior chief of police, not Randle, declined to discipline an African-American officer. In that circumstance, the officer had ordered a suspect to get on the ground, and the suspect instead reached into his pocket so that the officer believed the suspect was reaching for a weapon to shoot the officer. The chief in that case testified that he took note of the fact that the incident occurred at night when deciding not to discipline the officer. Other incidents alleged by Dismuke did not involve shootings, but rather infractions such as inappropriate comments and uniform violations. Thus, no incidents pointed to by Dismuke satisfy the requirement under Mayberry that a plaintiff point to nearly "identical" circumstances in order to establish a prima facie case based on inequitable discipline of officers under similar circumstance.

8

whether he violated an IPD policy and, thus, whether he established a prima facie case.[7]  We also agree with the district court that the City and Randle then discharged their burden by asserting a legitimate nondiscriminatory reason for Dismuke's discharge -- namely, Randle's belief that Dismuke violated the IPD policy against use of excessive force.  We further agree with the district court, however, that Dismuke fails to adduce sufficient evidence in the record creating a material issue of fact regarding whether Randle's proffered reason was pretext for discrimination.

The district court correctly noted that we have held that, even where an employer objectively errs in concluding that an employee violated a work rule or policy, absent evidence of discriminatory motive for the employer's discipline of the employee, such error alone is insufficient to establish that the employer's proffered justification is pretext.  See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995) ("The

---

[7]  Dismuke testified that he fired his weapon before Hendon was out of harm's way but admits that he saw Hendon bounce off the vehicle before he fired.  Dismuke further testified that he was unaware of Hendon's location on the ground when he fired so that he believed that Hendon was still in danger.  Dismuke thus controverts Hendon's testimony that the shot was fired when Hendon was already out of danger because Hendon was out of the vehicle's path and thus that Hendon believed Dismuke acted against IPD policy.  This dispute in the testimony further supports the district court's finding that Dismuke created a material issue of fact regarding his prima facie case, but fails to disturb our agreement with that court's finding that Dismuke failed to offer evidence establishing pretext.

question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."); Little, 924 F.2d at 97 ("We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue.") (citation omitted). Moreover, in Mayberry, we rejected a plaintiff's attempt to establish pretext by merely reasserting prima facie evidence that he did not violate a work rule. 55 F.3d at 1091-92.

Like the plaintiff in Mayberry, Dismuke does little more to point to evidence of pretext than reassert his arguments made toward establishing his prima facie case. He claims, without supplying any evidence of specific incidents, that there is conclusive evidence in the record that Randle disciplined African-American employees less harshly than Caucasian employees. Additionally, Dismuke reasserts his argument that conflicting testimony indicating that Hendon changed his opinion regarding whether Dismuke made an appropriate decision to fire at Gardner indicates that Randle erred in deciding that Dismuke used excessive force and thus suggests that Randle's pursuit of Dismuke's dismissal is evidence of animus. Dismuke further asserts, without pointing to any evidence in the record, that Randle must have forced Hendon to change his testimony in pursuit of Randle's alleged discriminatory purpose. Dismuke fails to supplement the scant evidence in the record supporting his prima facie case with more than conclusory allegations that the reason

10

for his discharge was pretextual.  Thus, even viewing the evidence in the light most favorable to Dismuke, Dismuke fails to point to sufficient evidence in dispute upon which a reasonable trier of fact could conclude that Randle's decision to discharge Dismuke, even if objectively in error, was pretext for discrimination based on race.  Consequently, the district court did not err in finding that the defendants are entitled to judgement as a matter of law on Dismuke's § 1981 claim.

## IV.   STATE LAW RETALIATORY DISCHARGE CLAIM

Dismuke claims that the district court erred in finding that he failed to sustain a claim of retaliatory discharge under Mississippi law.  Dismuke alleges that he was wrongfully discharged by Randle in retaliation for a report he made on January 5, 1999 to the Mayor and to the Mississippi Highway Patrol ("MHP"), alleging "illegal" acts by Randle.[8]  Dismuke is correct that Mississippi recognizes a tort cause of action when an employer discharges an employee in retaliation for the employee reporting illegal acts of the employer.  McArn v. Allied Bruce-Terminix Co., Inc., 626 So.2d 603, 607 (Miss. 1993).  The

---

[8]   On January 5, 1999, Dismuke filed a report to the Mayor, with a copy sent to the MHP, alleging that Randle committed various violations of the IPD Code of Conduct, including, inter alia, that Randle "cover[ed] up ... missing money from the evidence room ...." and removed "drugs" from the evidence room. Assuming arguendo that Dismuke's allegations satisfy the Mississippi Supreme Court's interpretation of what conduct constitutes "illegal" acts sufficient to afford an employee state law protection from retaliatory discharge, Dismuke's claim nevertheless fails for lack of evidence of causation.

11

district court found that the City and Randle were entitled to summary judgment, however, because Dismuke failed to point to any evidence in dispute that could establish retaliation. The court based this determination on its finding that Randle's testimony was uncontroverted that he was never aware of any report of wrongdoing made by Dismuke until after Dismuke's "termination." The district court thus found that Dismuke failed to adduce evidence of a causal link between his report and his termination.

Under Mississippi law, in order to sustain a claim of retaliatory discharge for reporting the illegal acts of an employer, a plaintiff must establish some causation between the reporting of the alleged misconduct and the decision process resulting in the discharge. See Hust v. Forrest Gen. Hosp., 762 So.2d 298, 301-02 (Miss. 2000) (affirming summary judgment in favor of an employer on a claim of retaliatory discharge because, although evidence indicated that the plaintiff employee reported wrongdoing to a co-employee, there was "no evidence" in the record that either the co-employee or the plaintiff "ever reported [the plaintiff's] concerns to anyone in a position to discharge or cause the discharge" of the plaintiff).[9] Moreover,

---

[9] It is unclear why the district court chose to adopt a Title VII approach in analyzing Dismuke's state law claim of retaliatory discharge and thus imported the causation requirement from the prima facie elements required to sustain a retaliatory discharge claim under Title VII. The case law fails to indicate that Mississippi courts have applied a Title VII analysis to state tort claims of retaliatory discharge; rather, the state tort claim is recognized as a narrow public policy exception to

12

our review of the record supports the district court's finding that Dismuke failed to adduce evidence that Randle was aware of the report prior to Dismuke's termination. The following question regarding Randle's awareness of Dismuke's January 5 report was posed to Randle during his deposition: "[Y]our testimony is that you did not see this document or know of the existence of this document prior to the shooting incident involving Mr. Dismuke?" Randle responded, "No." Dismuke points to no evidence in the record controverting this testimony or otherwise indicating that Randle was made aware of the January 5 report at any other time up to and including Dismuke's final termination by the Board.[10] Dismuke thus fails to adduce any evidence establishing a causal link between his report of

---

Mississippi's at-will employment doctrine. <u>E.g.</u>, <u>Hust</u>, 762 So.2d at 301. Regardless, the district court was correct in additionally citing <u>Hust</u> for the proposition that, to sustain a claim of retaliation, the Mississippi Supreme Court requires that a plaintiff establish some causal link between a report of wrongdoing made by the employee and the decisionmaker's discharge of that employee. <u>Id.</u> at 301-02.

[10] We disagree with the district court's characterization that Randle's <u>testimony</u> indicated that he was never aware of the report until after Dismuke's "termination." The deposition testimony supplied to the district court in support and defense of the motion for summary judgment only indicates that Randle testified that he was not aware of the January 5 report at any time prior to the shooting incident. However, because no evidence in the record indicates that Randle was made aware of the report at any time prior to Randle's decision to terminate Dismuke or prior to Dismuke's termination by the Board, we agree with the district court's ultimate conclusion that Dismuke fails to point to any evidence indicating causation between the report and Dismuke's discharge.

13

Randle's alleged misconduct and his discharge. Dismuke thus offers no evidence upon which a reasonable trier of fact could conclude that he was discharged in retaliation for making that report.[11] The district court did not err, therefore, in finding that the defendants are entitled to judgment as a matter of law on Dismuke's state law claim.

## V.  CONCLUSION

For the foregoing reasons, the district court's summary judgment in favor of the City and Randle on Dismuke's § 1981 claim of racially discriminatory discharge is AFFIRMED. The district court's summary judgment in favor of the City and Randle on Dismuke's state law claim of retaliatory discharge is likewise AFFIRMED.

---

[11]  Dismuke testified that on January 12, 1999, he had a confrontation with an IPD employee, Andrea Pat Coleman, during which Dismuke alleges that he made comments regarding an alleged intimate relationship between Coleman and Randle. Dismuke testified that subsequent to the confrontation, Randle reprimanded Dismuke for those comments. Affidavit testimony of Officer Charles Smith confirms that Dismuke had some form of verbal confrontation with Coleman that was discussed between Dismuke, Randle and Smith. Dismuke claims that this incident creates a material issue of fact regarding whether Randle was aware of any report of Randle's wrongdoing made to the Mayor and the MHP when deciding to discharge Dismuke. The defendants are correct in pointing out, however, that the record fails to indicate any evidence that Dismuke's report of alleged wrongdoing by Randle was mentioned to either Randle or Coleman during this confrontation or at any other time prior to Dismuke's termination. This allegation without more, therefore, is insufficient to create a fact issue material to Dismuke's claim of retaliatory discharge.

14